IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICHAEL OKPOR, :
:
    Plaintiff, :
:
v. : Civ. No. 15-480-LPS
:
TRANS CARGO LLC, et al., :
:
    Defendants. :

Michael Okpor, Berlin, New Jersey, Pro Se Plaintiff.

Michael Silverman, Esquire, and Robert C. McDonald, Esquire, Silverman McDonald & Friedman, Wilmington, Delaware. Counsel for Defendants Trans Cargo LLC and Luis M. Mundy.

William A. Crawford, Esquire, Franklin & Prokopik, Wilmington, Delaware. Counsel for Defendants AES Shipping and Michael DeCandia.

**MEMORANDUM OPINION**

March 16, 2018
Wilmington, Delaware


STARK, U.S. District Judge:

## I. INTRODUCTION

Plaintiff Michael Okpor ("Plaintiff") proceeds *pro se* and has been granted leave to proceed *in forma pauperis*. He filed this lawsuit on June 11, 2015, alleging violations of his civil rights, consumer fraud, theft, and breach of contract. (D.I. 2) An amended complaint was filed on September 16, 2017. (D.I. 7) The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Presently before the Court are Defendants' motions for summary judgment, opposed by Plaintiff. (D.I. 40, 42)

## II. BACKGROUND

**The Allegations.** The matter arises over a dispute between Plaintiff and Defendants regarding the shipment of three vehicles to Nigeria. Plaintiff alleges that he paid several thousands of dollars towards storage of the vehicles, that Defendants AES Shipping ("AES") and Trans Cargo, LLC ("Trans Cargo") kept the original titles of the trucks, and would not release the titles to him even after he paid the storage fees. The vehicles were stored on the property of Trans Cargo for several years without being shipped. Plaintiff was involved in an accident and later disabled. He notified Trans Cargo and AES about his disability. When Plaintiff went to Trans Cargo to retrieve his vehicles in April 2015, he was told he was required to pay for the storage of the three vehicles before Trans Cargo would release them. Plaintiff returned in May 2015 to pay the storage costs, only to discover that just two vehicles were available, the third (the best dump truck) having been sold by Defendant Luis Mundy ("Mundy"), the manager of Trans Cargo. Plaintiff paid almost $5,000 for storage of the remaining two trucks, but was not given the original titles of the trucks.

Mundy told Plaintiff the truck titles were held by Defendant Michael DeCandia ("DeCandia") of AES. Plaintiff confronted Mundy. Plaintiff alleges that Mundy called him racist names, made racial threats, and told DeCandia not to give Plaintiff the titles for the trucks. Plaintiff spoke to DeCandia, whom he alleges also called him racist names. Plaintiff alleges that Mundy and

1

DeCandia worked together and acted in a racially discriminatory manner towards him, and their discriminatory and illegal acts "offended, humiliated and tended to degrade Plaintiff to his demand of his trucks and titles."

The case proceeds on claims raised under 42 U.S.C. §§ 1982, 1985, and 1986, as well as supplemental State claims of fraud and breach of the implied covenant of good faith and fair dealing. (D.I. 5, 6, 8, 9)

**Evidence of Record.** AES is an international shipping agent that, among other things, arranges for the shipment of vehicles to West Africa, including Nigeria. (D.I. 41 at Ex. 2) DeCandia is the Vice President of Operations for AES and has worked there since June 2005. (*Id.*) Trans Cargo is a terminal business that ships and loads vehicles. (D.I. 41 at Ex. 3 at 6; Ex. 4 at 5) At various times, Plaintiff, who was born in Nigeria, contacted AES to arrange for shipment of vehicles from the United States to Nigeria. (D.I. 41 at Ex. 1 at 6; Ex. 2) To arrange for the booking of vehicles for shipment overseas, customers submit a letter of intent to AES and attach a copy of the vehicle's title. (D.I. 41 at Ex. 2) Upon receipt, AES then prepares a dock receipt, which it provides to the customer. (*Id.*) The customer is responsible for making four copies of the dock receipt and the vehicle's title and taking those materials with the original title to the port. (*Id.*) Before a customer can hand the vehicle and the materials off at the port to a terminal receiver -- like Trans Cargo, which loads vehicles onto the ships -- customers with a history of payment delinquencies are required to make prepayment to AES in order for their vehicles to be released for shipment. (*Id.*) Plaintiff was considered a customer with a history of payment delinquencies. (*Id.*) For customers with a history of payment delinquencies, the vehicle is not approved for shipping until AES receives the full payment. (*Id.*)

Plaintiff used AES and Trans Cargo to ship trucks to Africa. (D.I. 41 at Ex. 1 at 15) He described the process of shipping a vehicle from the United States to Nigeria, using AES as the

2

shipping agent and Trans Cargo as the cargo loader. "In fact, the process is just simple. First of all, you send the title, the copy of the title, to AES. AES has to send you back a dock receipt. Your dock receipt, you have to make four copies of dock receipt and four copies of your original title. You take it to Delaware, to Trans Cargo. Trans Cargo will stamp it 'received,' the original copy of the title and send it to Customs for clearance. After clearance, Trans Cargo load the truck for shipment." (*Id.* at 16) Once the titles to the vehicles pass through U.S. Customs at the port, Customs stamps the title. (*Id.* at 54) AES keeps the title, but it cannot use the title for any other purpose. (*Id.* at 55)

Plaintiff does not recall the actual dates, but around 2012 he approached AES and Trans Cargo about shipping two dump trucks and a tractor-trailer to Nigeria. (*Id.* at 17, 19, 20) Plaintiff had a customer who wanted to buy the vehicles. (*Id.* at 20) Plaintiff dealt with DeCandia. (*Id.* at 21) At some time during the shipping process, Plaintiff became disabled following a serious automobile accident in 2012. (*Id.* at 11, 23) Plaintiff testified that the trucks were not shipped because he became disabled. (*Id.* at 23)

The business records of AES include records of vehicles that Plaintiff sought to ship including a 1971 Mack Truck with VIN # DM685SX4862, a 1971 Mack Truck with VIN # R685ST16339, and a 1972 Mack Tractor with VIN # R685ST30602. (D.I. 41 at Ex. 2) For each vehicle, Plaintiff filled out a letter of intent to arrange for shipment of the vehicle and furnished a copy of the vehicle's title. (*Id.*) The records also include a copy of the dock receipt for each vehicle as completed by U.S. Customs after its examination of each vehicle. (*Id.*) Plaintiff's letter of intent claimed the vehicles were valued at $10,000, $12,000, and $6,000, respectively, despite each vehicle's age and the high mileage listed on each of the vehicle's title.[1] (*Id.*) The first vehicle was inspected by

---

[1] The reverse of the title for the 1972 Mack Tractor, VIN # R685ST30602, indicates it sold on November 20, 2013 for $700.

3

U.S. Customs on March 18, 2012, the second on December 12, 2012, and the third on July 1, 2013; each was parked on Trans Cargo property sometime shortly after its inspection. (*Id.*)

AES received a copy of a letter dated May 16, 2014 from Trans Cargo to Plaintiff referencing the three vehicles (1971 Mack Truck with VIN # DM685SX4862, 1971 Mack Truck with VIN # R685ST16339, and 1972 Mack Tractor with VIN # R685ST30602). (*Id.*) The letter indicated: the three vehicles had not shipped due to lack of payment and mechanical issues; the vehicles had been in Trans Cargo's possession since as early as March 29, 2012 without payment; the amount due for each vehicle; and Plaintiff would be given one month from the date of the letter to make payment on the vehicles and move them before the vehicles would be considered abandoned. (*Id.*) The letter warned Plaintiff that if the fees were not paid and the units not removed by June 20, 2014, the units would be considered abandoned under Delaware law and Trans Cargo would have the units scrapped or sold. (*Id.*)

In April 2015, Plaintiff went to Trans Cargo and told them he was injured, so he could not pick up his vehicles until May. (D.I. 1 at Ex. 1 at 50) At that time, he had not made any payments for storage. (*Id.*) Plaintiff understood that when he retrieved the trucks, he would have to make payment. (*Id.*) Plaintiff testified that the agreed-upon storage fee for trucks is calculated on a day by day basis. (*Id.* at 50-51)

In May 2015, Plaintiff went to Trans Cargo. (*Id.* at 24) Plaintiff testified that Trans Cargo did not ship his trucks and he told its manager that he was coming with a tow truck to pick them up. (*Id.*) When Plaintiff arrived, there were only two trucks and he asked, "where is the best truck among them?" (*Id.*) Mundy told Plaintiff that the truck was sold, using "all kind of racial word[s]" and insulting him. (*Id.* at 24, 31, 34) Mundy told Plaintiff that DeCandia authorized the sale of the vehicle. (*Id.* at 27) Plaintiff stated that he was never notified that his truck would be sold. (*Id.*) On

that day, Plaintiff paid a $4,000 storage fee for the trucks, and he had a wrecker tow the two vehicles from the property. (*Id.* at 25)

Mundy told Plaintiff she did not have the title to trucks and for Plaintiff to return on Monday to pick them up. (*Id.*) When Plaintiff returned the next week, Mundy told him that AES would not release the titles. (*Id.*) Mundy told Plaintiff she sold the truck because it was abandoned, but Plaintiff testified that the proper procedure was not followed. (*Id.* at 49) While there, Plaintiff telephoned AES and spoke to DeCandia. (*Id.* at 27) Plaintiff demanded his dump truck, stating that he paid for the storage for three trucks and wanted to pick up his vehicles. (*Id.* at 27, 35) The conversation was on speaker phone and the manager, Michael, was present. (*Id.* at 38) According to Plaintiff, during the conversation DeCandia called him the "N word." (*Id.* at 36-39) DeCandia denies calling Plaintiff any racial names or using any racial epithets, states that he harbors no racial animus towards Plaintiff, and insists he never racially discriminated against Plaintiff. (D.I. 41 at Ex. 2) Plaintiff testified that DeCandia stated he had the title, but would not give it to Plaintiff until Plaintiff had his lawyer talk to him. (D.I. 41 at Ex. 1 at 36) Plaintiff testified that had he known he was not getting the title to the truck he would not have paid a dime because it makes no sense to pick up a truck without the title. (*Id.* at 39) Plaintiff testified that he could not get a duplicate title from the Department of Motor Vehicles because the titles were not in his name but, instead, were in the names of the buyer with the buyer's signature on the title. (*Id.* at 31) After Plaintiff retrieved the two remaining vehicles, he placed them in storage, because he was unable to ship them since he did not have the titles, and then lost them because he unable to pay the storage fees. (*Id.* at 26-27)

According to DeCandia, Plaintiff did not make proper prepayment for the release for shipment of these three vehicles to Nigeria. (D.I.41 at Ex. 2) Also, according to DeCandia, neither he nor AES received any money or other compensation from Trans Cargo or Mundy related to

Trans Cargo's storage of Plaintiff's three vehicles or Trans Cargo's sale of one of Plaintiff's vehicles. (*Id.*)

Michael Norvell ("Norvell"), the terminal manager for Trans Cargo, testified that Plaintiff owed Trans Cargo money for storage, it was never paid, and, as a result, Trans Cargo kept Plaintiff's trucks. (D.I. 41 at Ex. 3 at 12) Norvell has no information that Mundy called Plaintiff racial names. (*Id.* at 9) He never saw or heard Mundy act in a manner towards Plaintiff that was motivated by racism. (*Id.*) He was not privy to any communications between Mundy and Plaintiff. (*Id.*)

Susan Scofield ("Scofield") is, like Mundy, a terminal administrator for Trans Cargo. (*Id.* at Ex. 4) Scofield overheard conversations between Plaintiff and Mundy and has no information that Mundy ever called Plaintiff a racial name or threatened Plaintiff with racial discrimination. (*Id.* at Ex. 4 at 6-7) She is unaware of any discrimination directed against Plaintiff by any of the defendants or any conspiracy between AES and Trans Cargo directed at Plaintiff. (*Id.* at 9, 10, 12) Scofield testified that Plaintiff's trucks were at Trans Cargo for a long time, they accumulated storage, and once you pay the storage you get your trucks back but Plaintiff would never pay the storage. (*Id.* at 8) Trans Cargo has the right to sell the property after so many days. (*Id.*) Scofield was privy to conversations in which Plaintiff was told he owed money and he always wanted to speak to Norvell, the terminal manager. (*Id.*)

Plaintiff testified that prior to the incident at issue he had "no problem" with the AES Defendants and that he had no problems with them apart from the two days in May 2015. (*Id.* at 53) He testified he had a good working relationship with AES and Trans Cargo before this incident. (*Id.* at 56) Plaintiff blamed the incident on greed, because his good truck was sold. (*Id.* at 56-59)

### III. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also*

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

Defendants move for summary judgment on the grounds that: (1) they did not deprive Plaintiff his property rights on the basis of his race; (2) they did not conspire to deprive Plaintiff of his rights; (3) they operated reasonably and not in bad faith; and (4) they did not make false representations to Plaintiff. (D.I 40, 41, 42)

Plaintiff opposes and "demands" oral argument. (D.I. 48, 51) Plaintiff's opposition consists solely of argument and is not accompanied by a sworn affidavit or verified statement signed under penalty of perjury. Hence, it cannot be relied upon to defeat Defendants' motions for summary judgment. *See Byrne v. Monmouth Cnty. Dep't of Health Care Facilities*, 372 F. App'x 232, 233-234 (3d Cir. Mar. 24, 2010) (unsworn certification not supported by any documentation or factual testimony is insufficient to defeat summary judgment); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (nonmoving party cannot simply assert factually unsupported allegations to meet burden at summary judgment).

### A. 42 U.S.C. § 1982

Plaintiff was born in Nigeria. He alleges deprivation of his property by reason of race under 42 U.S.C. § 1982 due to Mundy selling one of his dump trucks. Defendants seek summary judgment on the grounds that there is no evidence the AES Defendants were in possession of Plaintiff's truck and there is no evidence that any Defendant deprived Plaintiff of his property rights due to his race.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every state and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "To establish a cognizable claim under § 1982, a plaintiff 'must allege with specificity facts sufficient to show . . . (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his [property] rights because of race." *Crane v. Cumberland Cnty.*, 64 F. App'x 838, 841 (3d Cir. Mar. 27, 2003) (quoting *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).

There is not evidence in the record from which a reasonable factfinder could find for Plaintiff on his § 1982 claim. There is no evidence that Defendants deprived Plaintiff of his property rights because of his race. While Plaintiff alleges that the individual Defendants called Plaintiff racial names, Plaintiff also testified the cause of the incident was greed. He did not testify that he lost his truck due to race. In addition, Plaintiff testified that prior to the events giving rise to this action, he had a good working relationship with Defendants. Finally, Plaintiff knew the truck could be sold once it was considered abandoned, and he knew the titles to the vehicles were not in his name.

Based upon the evidence of record, no reasonable jury could conclude that Defendants deprived Plaintiff of his property rights on the basis of race. Therefore, the Court will grant Defendants' motion for summary judgment on the § 1982 issue.

**B.    42 U.S.C. §§ 1985, 1986**

Plaintiff raises conspiracy claims under 42 U.S.C. § 1985 and § 1986. Defendants seek summary judgment on the grounds that they did not deprive Plaintiff of his rights as part of a conspiracy.

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: "(1) a conspiracy of two or more persons; (2) motivated by racial or class-based discriminatory animus designed to deprive,

directly or indirectly, any person or class of person to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or to the deprivation of any right or privilege of a citizen of the United States." *Petrosian v. Collins*, 479 F. App'x 409, 410 (3d Cir. May 8, 2012) (citing *Brown*, 250 F.3d at 805).

Summary judgment for Defendants on this claim is appropriate for a number of reasons. First, the evidence of record does not support a finding that Defendants were motivated by race to deprive Plaintiff of his rights. Rather, the record reflects the incident occurred as a result of Plaintiff's abandonment of his property or due to greed. Second, the evidence of record does not support a finding that Defendants made an actual agreement to conspire. Third, the claim is brought against alleged private conspirators, but the "Supreme Court recognizes only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel." *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 805(3d Cir. 2001) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993)). Neither of these interests are implicated by Plaintiff's claim. As no reasonable jury could find for Plaintiff on his § 1985 claim, the Court will grant Defendants' motion for summary judgment.

Finally, because summary judgment is appropriate for Defendants as to the § 1985 claim, Plaintiff cannot prevail under 42 U.S.C. § 1986. Without a § 1985 claim, there can be no claim under 42 U.S.C. § 1986. *See Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980) ("Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also."). Accordingly, the Court will grant Defendants' motion for summary judgment as to the § 1986 claim.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that Defendants breached the implied covenant of good faith and fair

dealing. Defendants move for summary judgment on the grounds that they operated reasonably and not in bad faith.

"Every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law. The implied covenant was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain." *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *10 (Del. Super. Jan. 17, 2002). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation, a breach of that obligation, and damages resulting from the breach. *See Charlotte Broadcasting, LLC v. David Broadcasting of Atlanta, L.L.C.*, 2015 WL 3863245, at *6 (Del. Super. June 10, 2015). The focus is whether, at the time of contract formation, the parties would have prohibited the conduct had they contemplated it or thought to negotiate about it. *See Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). A plaintiff must allege the breaching party's actions were motivated by an improper purpose reflecting bad faith. *See Dunlap*, 878 A.2d at 442. Applying the implied covenant has been described as a "cautious enterprise." *Cincinnati SMSA*, 708 A.2d at 992.

The evidence of record indicates that Plaintiff was aware that he could not store his vehicles for free, that a storage fee was imposed on a day to day basis, that his three vehicles were stored at Trans Cargo from 2012 through 2015 without payment, and that Plaintiff had made no payments as of April 2015. In addition, Plaintiff was notified in May 2014 that his vehicles had not been shipped to Nigeria due to lack of payment and mechanical issues and were listed as abandoned. Plaintiff was warned that if the fees were not paid and the units removed, they would be considered abandoned and Trans Cargo would have the units scrapped or sold. Even after receiving this letter, Plaintiff testified that he took no action until April 2015, nearly one year later.

11

There is no evidence of record that Defendants' actions in dealing with the vehicles were motivated by an improper purpose or in bad faith. Rather, the actions taken were a direct result of the lack of action taken by Plaintiff in his failure to make payment and/or to remove the units from the Trans Cargo property. There is no evidence of record to the contrary. Accordingly, the Court will grant Defendants' motion for summary judgment on this issue.

D. **Fraud**

Plaintiff alleges Defendants committed fraud by deceit or misrepresentation when he was told to pay the storage fee and pick up his vehicles only to discover that one vehicle had been sold. Defendants move for summary judgment on the grounds that they did not make any false representations to Plaintiff.

"At common law, fraud (or deceit) consists of: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Fraud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. *See Lock v. Schreppler*, 426 A.2d 856, 860-61 (Del. Super. 1981) (concealment of material facts); *Leech v. Husbands*, 152 A. 729, 731-32 (Del. Super. 1930) (same).

There is no evidence of record that any Defendant made false representations to Plaintiff, or that any Defendant knew or believed any representation made to Plaintiff was false. Plaintiff testified he was never notified that his truck would be sold, but the record contains a May 16, 2014 letter that notified him the property would be considered abandoned if he did not pay the storage fees and remove the units. In addition, in May 2015, when Plaintiff arrived he was told that one

12

truck had been sold. At that time, Plaintiff paid the $4,000 storage fee owed for the trucks, and the two remaining units were towed from the property. While Plaintiff may not agree with the actions taken by Defendants, the information they provided him was not fraudulent. Instead, Plaintiff was advised of the consequences of storing his units at Trans Cargo for an extended period without paying storage fees.

No reasonable jury could find on this record that the elements of fraud are met. Therefore, summary judgment is appropriate. The Court will grant Defendants' motion for summary judgment as to this issue.

V.  **CONCLUSION**

For the above reasons, the Court will grant Defendants' motion for summary judgment. (D.I. 40, 42) An appropriate Order will be entered.